THE STATE ex rel. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY vs. McFETRIDGE, State Treasurer.

*October 31 — December 12, 1882.*

RAILROADS.  *Amount to be paid for license.*

Under secs. 1211–1213, R. S., the amount of license money to be paid by an applicant for a license to operate a railroad in this state, is to be determined by the aggregate mileage of all of the railroads operated by such applicant, within the state, during the preceding calendar year, and the aggregate amount of the gross earnings of all of such roads during that time.

MANDAMUS.

The case is thus stated by Mr. Justice CASSODAY:

" This is a demurrer to the petition of the relator for a writ of *mandamus* to compel the state treasurer to issue to the relator a license to operate its railroad, and also separate licenses to operate each of the other railroads mentioned in the petition, respectively.  It appears, in effect, from the petition, that during the entire year 1881 the relator operated 1,099 68-100 miles of railroad in this state as follows, to wit: twenty miles under a lease from the Oshkosh & Mississippi Railroad Company, executed August 29, 1871; forty-nine miles under a deed of conveyance from the Mineral Point Railroad Company, made July 1, 1880; sixteen miles under a deed of conveyance from the Pine River Valley & Stevens Point Railroad Company, made October 12, 1880; 109 miles under a deed of conveyance from the Wisconsin Valley Railroad Company, made October 19, 1880; and the remaining 905 68-100 miles known as the *Chicago, Milwaukee & St. Paul Railway Company*.  The gross earnings of each of these several railroads for the year 1881, and the amount which each would have been required to pay, under the statutes, for a license to operate the same during the year 1882, in case said several railroads had each been operated solely

under and by virtue of its own charter, and independent of the others, would have been as follows, to wit:

|  | MILES. | GROSS EARNINGS. | LICENSE. |
|---|---|---|---|
| "O. & M. R. R. Co........ | 20 | $39,802 75 | $296 05 |
| "M. P. R. R. Co. .......... | 49 | 106,850 06 | 912 |
| "P. R. V. & S. P. R. R. Co. | 16 | 9,244 05 | 80 |
| "W. V. R. R. Co.. ....... | 109 | 267,720 66 | 2,629 41 |
| "Making ........... | 194 | $423,617 52 | $3,917 46 |
| "C. M. & St. P. R. Co..... | 905 68–100 | 6,944,935 32 | 277,797 41 |
| "Totals............. | 1,099 68–100 | $7,368,552 84 | $281,714 87 |

"On the day of receiving the several deeds of conveyance of said several railroads, respectively, the relator also procured by transfer to itself the stock, or a majority thereof, in each of said railroads. These facts were all duly reported to the state treasurer prior to demanding the several licenses in question, and the amount of the several licenses which said railroads, respectively, would have been required to have paid had each of said roads been operated solely under its own charter, and independent of the others, amounted in the aggregate to $281,714.87, as above stated, and the same was duly paid by the relator."

*The Attorney General* and *H. W. Chynoweth*, Assistant Attorney General, for the respondent.

*John W. Cary*, for the relator.

CASSODAY, J. This is an amicable controversy to obtain a construction of the statutes respecting the licensing of railroads. It is urged by the attorney general, in behalf of the state treasurer, that the amount of license money to be paid by the relator for the year in question is to be determined by the aggregate number of miles of all of said several railroads operated by the relator within the state, and the aggregate amount of the gross earnings of all of said roads, and that as such gross earnings when so taken were in excess of $3,000 per mile per annum of the number of miles so operated by

the relator, it was required to pay four per centum of such gross earnings, or $294,742.11, being the amount exacted by the state treasurer. On the other hand, it is claimed by the learned counsel for the relator that each of the several railroads operated by the relator should be treated as separate and independent roads, and that the amount of license to be paid by each should be determined by the length of its line and the gross earnings thereof. If counsel for the relator is right in this contention, then the amount of license which the relator was required to pay on its main line was $277,797.41, and on the other four roads the aggregate amount of $3,917.46, making in all $281,714.87, or $13,027.24 less than the amount exacted by the state treasurer; and this is the exact amount which is here in controversy.

The statutes provide, in effect, that "every railroad company, and every person *operating* a railroad in this state, . . . shall, on or before the 10th day of February in each year, make and return to the state treasurer . . . a true statement of the gross earnings of their respective roads for the preceding calendar year, of the number of miles of road *operated* by each such company or person, and the gross earnings per mile per annum during such year, which statement shall be verified by the oath of the secretary and treasurer of such companies, or of the person so *operating* such railroad." Sec. 1211, R. S. "Each such railroad company and each person *so operating* any railroad shall, on returning such statement, apply for a license *to operate* the railroad mentioned in such statement, and shall pay the license fee therefor provided in the next section, and thereupon shall receive from the state treasurer a license to *operate* such railroad for the calendar year," etc. Sec. 1212, R. S. "The annual license fees for the *operation* of such railroad shall be as follows: (1) Four per cent. of the gross earnings of all railroads . . . whose gross earnings equal or exceed $3,000 per mile per annum of *operated railroad*.

(2) Five dollars per mile of *operated railroad* of all railroads whose gross earnings exceed $1,500 per mile per annum, and are less than $3,000 per mile per annum of *operated road*, and in addition two per centum of their gross earnings in excess of $1,500 per mile per annum. (3) Five dollars per mile of *operated road* by all companies whose gross earnings are less than $1,500 per mile per annum." Sec. 1213, R. S.

Thus it appears from the reading of these sections that the words " operated," " operate," and " operating " are the controlling words in the sections. It is a " license to operate the railroad." A license is a grant of permission or authority. As used in these sections of the statute, it is permission or authority issued or granted to a corporation or individual, by or under the sanction of the sovereign power of the state, to operate one or more railroads. It is claimed on the part of the relator that it is a tax or burden upon the particular road, not upon the owner or operator, and that the product of the operation of the road is resorted to merely to fix the value of the road, and thus measure the extent of the burden. It is claimed that the gross earnings of the roads purchased have not been increased since the purchase, and that since the law on the subject has not been changed, the amount of such tax or burden should not be increased merely because those roads have been operated by the relator instead of being operated by the corporations under which they were respectively constructed. The argument is plausible. It was presented with great force, and a variety of illustrations, well calculated to impress the court with the inequality of increasing the price of the license merely because it is granted to A. instead of B. But whether it has such effect, or not depends somewhat upon the circumstances. Suppose the gross earnings of the *Chicago, Milwaukee & St. Paul Railway* were just $3,000 per mile, while the gross earnings of the other roads named should remain just what they were in 1881, then, manifestly, the rule contended for by the

attorney general would be vastly more beneficial to the relator than the rule now claimed by its counsel, and hence would be correspondingly unjust to the state. The same would be true if the gross earnings of each of the other roads named were increased to $3,000 per mile per annum, or the main line reduced below $3,000 per mile. Of course there is no certainty that the gross earnings of those respective roads will always remain the same, or bear the same proportion to each other that they did in 1881. The injustice complained of, therefore, is not necessarily the result of the rule of construction insisted upon by the state treasurer, but the application of that rule when the gross earnings happen to be such as to work a disadvantage to the relator, and not when they happen to be such as to work an advantage to the relator.

While these considerations of advantage and disadvantage naturally suggest themselves to any one analyzing these sections of the statutes, yet they are not necessarily controlling upon the court. The propriety and policy of the statute were for the legislature. We are simply to ascertain and declare the intention of the legislature. Manifestly that intention was not to put a tax or burden upon any railroad that is idle, nor upon the owner of such a railroad. To come within the provisions of the statute, the railroad must be operated by some corporation or person. The thing to be paid for is the legal right or privilege to operate one or more railroads, or some part of a railroad. This right or privilege does not exist by mere ownership. It is not implied from the mere fact that a corporation has been chartered and organized, and a railroad constructed by such corporation. True, the assent of the owner must be acquired, but still with such assent the right or privilege remains in abeyance until purchased of the state in the manner prescribed. It is a pecuniary exaction as a condition precedent to the exercise of a right otherwise perfect. The amount of the exaction is measured

by the extent of such exercise as evinced by the gross earnings of the line or lines of railroad operated. The right or privilege to operate is to the grantee or licensee. The application for it need not necessarily be by the owner, but by the person or corporation which is to operate. The exaction is made of, and the payment must be made by, the operator. The gross earnings of such operations, and the number of miles operated by such applicant, fix the amount, under the statute, which the licensee is required to pay.

The statute nowhere provides that the same person or corporation may obtain several independent licenses to operate separate and independent railroads, and pay for each according to the gross earnings thereof and the number of miles operated. Had such been the purpose of the legislature, it is fair to presume that they would have so expressed themselves. On the contrary, sec. 1833, R. S., gave the right of consolidation to such railroads as could respectively be lawfully connected and operated together to constitute one continuous main line, with or without branches. It also gave a railroad company the right to lease or purchase another railroad whenever their respective railroads could be lawfully connected and operated together so as to constitute one continuous main line, with or without branches. But it expressly prohibited every railroad corporation from consolidating with, or leasing, purchasing, or in any way becoming the owner or controller of, any other railroad corporation, or any stock, franchises, rights, or property thereof, which owns or controls a parallel or competing line, to be determined by a jury. The only material change of these provisions by ch. 260, Laws of 1880, was to limit the right of leasing or purchasing to any railroad corporation whose line is wholly within this state. This amendment was changed by ch. 268, Laws of 1882, so as to give such right to " any railroad corporation organized and existing under the laws of this state," and then enlarged such right of one railroad company to purchase

" stock or bonds " of another railroad company, and to lease or purchase " any portion " of another railroad " within or without this state, when their respective railroads can be lawfully connected together to constitute one continuous main line, or when the roads so purchased will constitute branches or feeders of the roads maintained and *operated* by such purchasing corporation; " but preserved the prohibition against consolidation, leasing, purchasing, etc., by one "parallel and competing line " with another.

These several provisions pretty clearly evince an intention to allow the same corporation to operate several lines of railroad, provided they are not parallel and competing lines, but are capable of being connected together so as to constitute one continuous main line, or when the road or roads so leased or purchased will constitute branches or feeders of the railroad of the purchasing corporation operating the same. Such being the legislative intent, it should not be frustrated by granting to such purchasing corporation a license to operate its main line, and then separate and independent licenses to operate each of the several branches and feeders so purchased and leased, respectively, for such sums as the gross earnings and line of such operated roads respectively might indicate. Here the relator operates, not only its main line, but the different branches and feeders named in the petition, and, in view of the language of the statutes, we are clearly of the opinion that the state treasurer was justified in refusing to issue the several licenses demanded for the money paid.

For the reasons given the demurrer to the petition for a writ of *mandamus* must be sustained.

*By the Court.*— It is so ordered.