The State ex rel. Abbot and another vs. McFetridge, State Treasurer.

THE STATE ex rel. ABBOT and another vs. McFETRIDGE, State Treasurer.

*May 8 — October 13, 1885.*

TAXATION: RAILROADS: CONSTRUCTION OF STATUTES. *(1, 2) Statutes imposing taxes strictly construed. (3: 1) Railroad license fees: Gross earnings: Road operated but part of a year. (3: 2, 3) Change of company operating road. (3: 4) Spur tracks. (3: 5) Leased road. (3: 6) Earnings for car service.*

1. Statutes imposing license fees which are, to all intents and purposes, taxes, should be governed by the sames rules of construction as those imposing taxes *eo nomine*.
2. Such statutes should be construed with reasonable strictness against the government; and where the terms used are susceptible of two meanings, that should be preferred which imposes the lighter burden. CASSODAY, J., dissents.
3. Sec. 1211, R. S., provides that railroad companies and persons operating railroads in this state shall annually make and return a

The State ex rel. Abbot and another vs. McFetridge, State Treasurer.

"statement of the gross earnings of their respective roads for the preceding calendar year, of the number of miles operated by each such company or person, and the gross earnings per mile per annum during such year." Sec. 1212 provides that the company or person "so operating any railroad shall, on returning such statement, apply for a license to operate" such railroad, and shall pay the license fee provided in sec. 1213. Sec. 1213 divides railroads into classes according to the gross earnings "per mile per annum of operated road," and fixes the license fee for each class. *Held:*

(1) In determining the class to which any railroad belongs, the number of miles operated and the gross earnings during the preceding calendar year only are to be considered, regardless of the length of time that the road was operated during that year. CASSODAY, J., dissents.

(2) The statement required is only of the earnings of railroads which the applicant is operating when the return is made, and for the privilege of operating which he is required to obtain license.

(3) When one company commences operating a road early in any given year, and the same was operated by another company during the preceding year, the earnings of the latter company thereon form the proper basis for computing the license fee to be paid by the company first mentioned.

(4) Spur tracks are to be included in the mileage of a railroad.

(5) The rental paid for a leased railroad is not to be deducted from the gross earnings upon which the license fee to be paid by the lessee is computed.

(6) The amount received by a company for the use of its cars, in excess of the amount paid out by it for the use of the cars of other companies, is a part of the gross earnings upon which the license fee is to be computed.

MANDAMUS.

Prior to 1879 the Wisconsin Central Railroad Company, a corporation of this state, issued certain bonds, and, as security therefor, executed its certain mortgage or trust deed to the relators as trustees for the holders of such bonds. The railroad company having failed to pay the interest due on the bonds, the relators, in January, 1879, pursuant to the trusts of said deed, and in due execution of the powers therein conferred upon them, took possession of the railroad of said company, and all other property covered by such

trust deed, and have held the same and operated such railroad for the benefit of the bondholders from that time until the commencement of this proceeding. During some portion of that time they also, as such trustees, and in execution of the said trust, operated certain other leased lines of railway in this state.

On or about February 10, 1883, for the purpose of procuring a license to operate their railroads during that year, the relators presented to the state treasurer, the respondent, a statement of the gross earnings during 1882 of the railroads which they were operating, of the number of miles of road so operated by them, and the gross earnings per mile during such year, in attempted compliance with the requirements of sec. 1211, R. S. This statement placed the roads operated by the relators in the second class of sec. 1213, R. S., which fixes the license fee at five dollars per mile of operated road, and two per centum on the gross earnings in excess of $1,500 per mile. The relators thereupon paid such license fee to the respondent at the times specified in the statute, and demanded that he issue to them a license to operate their said roads during the current year, pursuant to sec. 1212, R. S. The treasurer refused to issue such license, alleging certain inaccuracies in and omissions from the said statement of the relators, which, when corrected, would show the gross earnings of the relators' roads for 1882 to be over $3,000 per mile, thus bringing those roads within the first class of sec. 1213.[1] The treasurer thereupon

---

[1] Secs. 1211–1213, R. S., are as follows:

"SECTION 1211. Every railroad company, and every person operating a railroad in this state, except railroads operated by horse-power, shall, on or before the tenth day of February in each year, make and return to the state treasurer, in such form and upon such blanks as shall be furnished by him, a true statement of the gross earnings of their respective roads for the preceding calendar year, of the number of miles of road operated by each such company or person, and the gross earnings per mile per annum during such year; which statement shall be

demanded that the relators pay four per cent. of the gross earnings of their roads in 1882 as a condition precedent to the granting of such license. The relators refused to pay the required license fee, and thereupon, on a petition or relation showing the above facts, applied to this court for a writ of *mandamus* to the state treasurer requiring him to issue such license. An alternative writ was accordingly allowed and issued. The treasurer made due return thereto, and the relators have interposed a reply to such return. The case now comes before the court on the motion of the relators to order a jury trial of the issues of fact alleged to have been raised by the petition, return, and reply; and on

verified by the oath of the secretary and treasurer of such companies, or of the person so operating such railroad.

"SECTION 1212. Each such railroad company and each person so operating any railroad shall, on returning such statement, apply for a license to operate the railroad mentioned in such statement, and shall pay the license fee therefor provided in the next section; and thereupon shall receive from the state treasurer a license to operate such railroad for the calendar year commencing on the first day of January preceding, and terminating on the next succeeding thirty-first day of December, unless sooner revoked.

"SECTION 1213. The annual license fees for the operation of such railroads shall be as follows:

"1. Four per centum of the gross earnings of all railroads except those operated on pile and pontoon, or pontoon bridges, whose gross earnings equal or exceed three thousand dollars per mile per annum of operated railroad.

"2. Five dollars per mile of operated railroad of all railroads whose gross earnings exceed one thousand five hundred dollars per mile per annum, and are less than three thousand dollars per mile per annum of operated road, and in addition two per centum of their gross earnings in excess of fifteen hundred dollars per mile per annum.

"3. Five dollars per mile of operated road by all companies whose gross earnings are less than fifteen hundred dollars per mile per annum.

"4. Two per centum of the gross earnings of all railroads which are operated upon pile and pontoon, or pontoon bridges; which gross earnings shall be returned as to such parts thereof as are within the state.

"One half of such license fee shall be paid at the time the license so issues, and one half on or before the tenth day of August in each year."

the motion of the respondent to dismiss the petition and alternative writ.

The following is a sufficient summary of the pleadings: It appears in the relators' petition for a writ of *mandamus* that their statement to the respondent of February, 1883, showed that the gross earnings in 1882 of the railroads operated by them was $1,030,900.11, and the total mileage of such roads was 440.42 miles. This is a fraction over $2,340 per mile per annum, and brings the roads of the relators within the second class of sec. 1213, R. S. Of the above earnings, $1,016,948.13 is stated to have been earned on the "Wisconsin Central Railroad and Packwaukee and Montello Branch," and $14,579.63 on the "Milwaukee and Lake Winnebago Railroad, and leased track from Schleisingerville to Milwaukee." It is stated in the relation or petition that the relators operated the Central Railroad and Montello Branch, above mentioned, during the year 1882; and the Milwaukee & Lake Winnebago Railroad, and the track of the Chicago, Milwaukee & St. Paul Railway from Schleisingerville to Milwaukee, from December 17, 1882, to the end of the year, under a lease; all of which roads they were operating when they applied for a license in February, 1883, as part of the Wisconsin Central Railroad. It is further stated therein that from January 1, 1882, until July 31 of that year, the relators operated the road of the Milwaukee & Northern Railroad Company under a contract with that company, which the relators terminated in the manner therein provided; that they have not operated such road since the date last aforesaid, and did not intend to operate it thereafter, and did not include the same in their statement to the respondent of February 10, 1883.

The return of the respondent to the alternative writ of *mandamus* controverts the statements of the relators contained in the petition, both as to gross earnings and mileage of the roads operated by the relators in 1882. The follow-

The State ex rel. Abbot and another vs. McFetridge, State Treasurer.

ing table contains an abstract of the return in those particulars:

| NAME OF RAILROAD. | TIME OPERATED IN 1882. | | DISTANCE IN MILES. | GROSS EARNINGS. |
|---|---|---|---|---|
| | FROM | TO | | |
| Wisconsin Central...... | Jan.  1.. | Dec. 31.. | 319.92 ⎱ | $1,016,948 13 |
| Packwaukee & Montello | Jan. 26.. | Dec. 31.. | 7.10 ⎰ | |
| Milwaukee & Lake Winnebago ............ | Dec. 17.. | Dec. 31.. | 63.30 | 13,010 51 |
| C., M. & St. P. (Schleisv. to Mil.)............. | Dec. 17.. | Dec. 31.. | 33.00 | 1,569 12 |
| Milwaukee & Northern. | Jan. \ 1.. | July 31.. | 124.40 | 333,458 19 |
| C., M. & St. P.(Schwartzburg to Mil.)......... | Jan.  1.. | Aug. 31.. | 9.00 | 28,226 99 |
| Car service (estimated).. | .......... | .... ..... | .......... | 27,500 00 |

The respondent, in his return, claims that the item for car service should be included in the gross earnings of the relators. This is understood to be the amount received by them for the use of their cars on other railroads. He also claims that 15.47 miles of spur track operated with the relators' railroads should not be included in the total mileage of such railroads.

The reply of the relators to such return affirms the accuracy of their statement to the respondent of February 10, 1883, except that it states the total length of their roads to be five miles less than the actual length. It avers that the Milwaukee & Northern Railroad, so operated by them in 1882, is 140 miles in length, and that their gross earnings thereon while they operated it was but $218,099.73, exclusive of $14,153.33, paid as rental for the use of the track between Schwartzburg and Milwaukee, their use of which ceased with the surrender of their contract with the Milwaukee & Northern Company. The reply further alleges that the relators operate seventeen miles of spur track run-

ning to mills, etc., and that the use of these adds materially to the earnings of their railroad; also, it states the course of business with other railroads, out of which the car-service fund arises. The remaining averments of the reply are chiefly cumulative to those contained in the petition.

*S. U. Pinney* and *A. L. Cary*, for the relators.

For the respondent there was a brief signed by the *Attorney General* and *H. W. Chynoweth*, Assistant Attorney General, and the cause was argued orally by *Mr. Chynoweth*.

The following opinion was filed June 24, 1885:

LYON, J. I. It must first be determined whether the roads operated by the relators in 1883, when they applied to the state treasurer (the respondent) for a license for that year, were within the first or second class of sec. 1213, R. S. The solution of this question depends upon the construction which shall be given to the two next preceding sections. It is maintained, on behalf of the respondent, that the earnings of the roads then operated by the relators, which they had operated but a small fraction of the year 1882, should not be taken as the total earnings of these roads for the whole year, but only as a rate or basis for computing what the earnings would have been had such roads been operated during the whole year, and had the earnings been at the same rate. That is to say, the contention of the respondent is that because the earnings on the Milwaukee & Lake Winnebago Railroad, and the track of the Chicago, Milwaukee & St. Paul Railway, extending from Neenah to Milwaukee, for the last fifteen days of 1882, far exceeded $3,000 per mile for that time, such must be taken to be the rate of earning on those roads during that year; and if, in aggregating the earnings of all the lines of railway operated by the relators, such rate would bring the aggregate earnings of all their roads above $3,000 per mile, then they are

The State ex rel. Abbot and another vs. McFetridge, State Treasurer.

within the first class, and a license fee of four per centum on the gross earnings of all their roads should be exacted of them.

On the other hand, the relators maintain that the statute does not authorize any such mode of computation; that it only requires them to make return of actual gross earnings in the preceding year, which must be the basis for ascertaining the amount they must pay for a license to operate their roads for the then current year; and that the state treasurer has no concern with the manner in which, or length of time during which, the roads have been operated in such preceding year.

To determine which of these positions is the correct one, the same principles must be observed which would control were the Milwaukee & Lake Winnebago Railroad from Neenah to Schleisingerville, and the Chicago, Milwaukee & St. Paul Railway from the latter place to Milwaukee, the only roads operated by the relators. Whether or not the system of roads operated by them is within the first or second class of sec. 1213, is merely incidental to the question under consideration, and cannot affect its solution.

Laying out of view, therefore, the fact that the relators operated other railroads in 1882, we have a case like this: The relators apply to the state treasurer on February 10, 1883, for a license to operate their roads from Neenah to Milwaukee during the then current year,— which roads constitute a continuous line, 96 3-10 miles in length,— and make due return to such treasurer that their earnings on those roads in 1882 amounted to $14,579.63. They pay the license fee required by subd. 2, sec. 1213, R. S. The treasurer does not question the accuracy of the return, but says to the relators: " You operated these roads but fifteen days in 1882, and the earnings you return are *at the rate* of over $3,000 per mile per annum. Hence your roads are within the first class of sec. 1213, and you must pay a license fee of four

per centum on such earnings for the privilege of operating them during 1883." Which of these conflicting positions is supported by the statute?

In the first place, it may be observed that the statute contains no express provision for a return of the time a road has been operated during the preceding year. It makes no mention of a user for a fraction of a year only. It requires a return of three facts — each a unit — to wit: (1) Gross earnings for the preceding calendar year of the roads operated by the applicant for a license; (2) number of miles of road so operated; and (3) "gross earnings per mile per annum during such year." But it was argued that the use of the term "per annum," in sec. 1211, fairly implies that the legislature intended that the earnings per mile during the preceding year should be ascertained by a computation, one factor of the problem being the length of time the road was operated during the preceding year. The statute requires applicants for license under it to return to the state treasurer "a true statement of the gross earnings of their respective roads for the preceding calendar year; of the number of miles of road operated by each such company or person; and the gross earnings per mile per annum during such year." It is correctly said that if the construction prevails for which the relators contend, the mileage earnings *per annum* are ascertained by simply dividing the total gross earnings by the number of miles of road operated, which is a problem in simple division that might readily have been worked out by the state treasurer without the aid of the applicant, and the argument is that unless the legislature supposed the problem more intricate it would not have required a solution thereof by such applicant.

It must be conceded that if the factor of time be introduced, the problem becomes more intricate. It thereby ceases to be a problem with but two known factors, from which a third is to be found, and becomes one with three

given factors, from which a fourth is to be found. It is the difference between a problem in simple division, and one in the "Rule of Three." The necessity for requiring the applicant for a license to find the fourth factor in the latter case, while it is left to the state treasurer to find the third factor in the other case, is not very apparent. The argument does not cast much light on the legislative intent.

But it was argued that the words "per annum" in sec. 1211 imply a rate, and that, unless such be their meaning as employed in the statute, the words are mere surplusage,—performing no office whatever. The claim of the relators is that the words mean "during the year." If so, the use of both terms in the statute is a tautology, and one or the other might as well have been omitted. There is some force in the position that the use of the term *per annum* implies the idea of a rate, one of the factors in the ascertainment of which would be the length of time during the preceding year the roads had been operated. If such effect is not given to it, no other can be, except to hold that it means what is thereinafter expressed, to wit, "during the year." The term may mean "by the year," which seems to imply a rate or proportion. But it may also mean "in the year," which excludes the idea of rate, and requires the computation of earnings per mile to be made upon the two factors alone of mileage and gross earnings during the year. See Webst. Dict.

Had the legislature intended that the earnings of a railroad for a fraction of the preceding year should be resorted to for the purpose of ascertaining what the road would have earned had it been as profitably operated during the whole year, and that the amount of such hypothetical earnings for the whole year should determine in which class of sec. 1213 the road should be rated, it seems to us that some more specific provision on the subject would have been inserted.

It is a reasonable inference that, had the legislature so intended, it would have provided that the applicant for a license should return the length of time the road had been operated during the preceding year, and the *rate* of such earnings per annum. Also, in the case of a road in process of being built, and which had been put in operation during the preceding year in sections at different times, provision would have been made for a return of the length of each section, the time it was put in operation, and the gross earnings of each. But the statute requires nothing of the kind, either expressly or by necessary implication, and furnishes no evidence of the intention claimed for it, except the doubtful and most unsatisfactory inference sought to be drawn from the use of what may reasonably be considered tautological phrases.

There is another consideration which is entitled to great weight in the construction of these statutes. They impose involuntary burdens for revenue purposes upon those who operate railroads. These impositions are called license fees, but in their objects and effects they are in the nature of taxes. Manifestly, the same rules which prevail in the construction of statutes imposing taxes *eo nomine*, should be applied to statutes imposing such license fees. It is quite elementary that such statutes must be construed with reasonable strictness against the government. If the state would impose pecuniary burdens upon its citizens, or a class of its citizens, it ought to be held to the obligation of defining the extent of such burdens with reasonable certainty. Failing to do so, resort should not be permitted to doubtful inference or strained construction to increase those burdens. If the terms used in the statute are susceptible of two meanings, that should be preferred which imposes the lighter burden. In the late case of *State v. Pullman's Palace Car Co. ante*, p. 89, the strict construction above suggested was

given to a statute imposing a license fee. A full discussion of the subject will be found in the opinion of the court in that case by Mr. Justice TAYLOR.

A brief consideration of the history of legislation on this subject will serve to support and emphasize the views already indicated. By sec. 182, ch. 18, R. S. 1858, every railroad company operating a railroad was required to return to the state treasurer, in January of each year, "a true and just statement of the gross earnings of their respective roads for the preceding year, up to the first day of January." The next section imposed a tax equal to one per centum of such earnings, in lieu of all other taxes. By ch. 140, Laws of 1858, the time for making such statement was changed to February. In 1859 certain statutes involving the same principle were declared invalid by this court in *Knowlton v. Supervisors*, 9 Wis. 410, and in other cases, because they violated the provision of the constitution which ordains that "the rule of taxation shall be uniform." (Art. VIII, sec. 1.) Thereupon the legislature of 1860 enacted that all property of railroad companies, used in operating their respective roads, should be exempt from taxation. Ch. 173, Laws of 1860. The legislature then enacted ch. 174 [Laws of 1860], which required each railroad company to make the same return to the state treasurer of its gross earnings, and at the same times, as required by the former statutes. Each company was then required to pay to the state treasurer one per centum of such earnings as a license fee for the privilege of operating its road during the current year. Ch. 22, Laws of 1862, increased such license fee to three per centum of such gross earnings; and by chapter 315 of 1874 it was again increased to four per centum thereof. There was no further legislation on the subject until 1876.

During all the time the above statutes were in force, no idea of a rate of taxation based upon the earnings of a railroad for a fraction of a year is suggested. Whatever a

railroad earned in one year, whether operated but a fraction of a year or the whole of it, whether its earnings were large or small in amount, was the basis upon which the license fee for the succeeding year was computed, and each company paid the same percentage of its gross earnings for its license.

Ch. 97, Laws of 1876, divides such railroads into three classes, on the basis of gross earnings per mile per annum, and imposes upon those who operate them a different rate of license on each class. This law properly discriminates in favor of the weaker roads by imposing the largest license fee upon those which earn $3,000 and upwards per mile per annum, and the smallest upon those which earn but $1,500 per mile, or less. This act merely makes such classification. It does not change the former laws in respect to the statements of earnings and mileage to be returned annually to the state treasurer. It contains nothing whatever from which it can justly be inferred that the legislature intended to require the return to show the length of time a road had been operated in the preceding year, which had been operated only a portion of such year. It contains no suggestion or hint of any change of the basis upon which license fees had theretofore been computed, and does not, either expressly or by reasonable implication, authorize the classification of any road upon the basis of hypothetical earnings. Secs. 1211–1213, R. S., are but a compilation of all the statutes above mentioned, and contain no additional rule on the subject.

On the argument of these motions, counsel for the relators filed with the court an unsigned printed discussion of some of the questions herein, which he stated was prepared by Mr. Turner, the former railroad commissioner. It is said therein that if a railroad be operated for only a fraction of a year, the " gross earnings per mile per annum " are to be ascertained " by spreading such earnings over the entire

line operated, in the same ratio that they were realized during the time the road was operated." This seems to agree with the theory of the state. The learned assistant attorney general rests his argument of this point mainly upon that proposition, and insists that the relators should be held bound by it. This, we think, would be entirely unjustifiable. The question is one of grave public concern, and no such circumstance should be allowed to interfere with its determination on the merits.

For the reasons above suggested we are constrained to hold that under existing statutes the respondent had no concern with the length of time during which the relators operated the roads from Neenah to Milwaukee, but that the only factors upon which he could determine the class to which those roads belonged, were their length, and the earnings upon them in 1882. This takes them out of the first class of sec. 1213. Aggregating the earnings of those roads, on that basis, with the gross earnings of the other roads operated by the relators in 1882, it brings their whole system of roads within the second class of that section.

II. Certain other questions of minor importance are involved in the determination of these motions, and will now be briefly considered.

1. The first question is whether the earnings of the Milwaukee & Northern Railroad from January 1 to July 31, 1882, and the earnings of the relators on the track of the Chicago, Milwaukee & St. Paul Railway, from Schwartzburg to Milwaukee, from January 1 to August 31 of that year (during which periods the relators used those roads), should be included in the gross earnings upon which the relators' license fee for the year 1883 should be computed. We think this question should be answered in the negative. Sec. 1211, R. S., requires "every railroad company, and every person *operating* a railroad in this state," to make and return before February 10th, in each year, to

the state treasurer, " a true statement of the gross earnings of their respective roads for the preceding calendar year." The next section requires the company or person *operating* any railroad, on returning such statement, to apply for a license to operate the railroad therein mentioned, and to pay the license fee required by sec. 1213. These statutes evidently contemplate that the return therein mentioned shall contain only a statement of the earnings of railroads which the applicant is *operating* when such return is made, and for the privilege of operating which he is required to obtain license. Hence we hold that the earnings of the above-named roads during the periods mentioned constitute no part of the gross earnings of the relators' roads upon which the license fee for 1883 is to be computed.

It should be observed in this connection that when one company commences operating a railroad early in any given year, and the same was operated by another company during the preceding year, the earnings of the latter company thereon is the proper basis upon which to compute the license fee to be paid by the company first mentioned. For example, if the Milwaukee & Northern Railroad Company operated its own road after August 1, 1882, and applied for a license to operate the same in 1883, the license fee to be paid by it should have been computed upon the gross earnings of the road during the whole of the year 1882, which, of course, includes the earnings of the relators thereon in that year.

2. From fifteen to seventeen miles of the relators' roads consist of spur tracks (so called), running from the main lines to sundry mills and manufactories away from such main lines, and are used to transport the products of those establishments to the main lines and to market, thus increasing the revenues of the road. We are clearly of the opinion that the length of these spur tracks should be included in the mileage of the relators' roads.

3. The relators claim (as we understand their reply) that the rental paid by them for a leased road should be deducted from the gross earnings on such road, and the license fee computed on the balance. We think no such deduction should be made. One company issues its bonds, raises money upon them, and expends it in building a railroad which it thereafter operates; another company rents a railroad already built. One company pays interest upon its bonds; the other pays rent. If rents should be deducted from gross earnings, why not interest on such bonds? We perceive no difference in the two cases. The deduction of either rent or interest is opposed to the idea of gross earnings, which the statute makes the basis of the license fee.

4. The respondent claims that there should be included in the gross earnings of the relators the estimated sum of $27,500 for car service. This means moneys received by the relators for the use of their cars on the railroads of other companies. The reply admits the receipt of $23,100 beyond what the relators paid other companies for the same service.

The course of business renders it absolutely necessary that the cars of one railroad company should be run upon the tracks of many other railroad companies. Accounts are kept between the different companies, and balances adjusted for such service. Up to the point where the accounts between the various companies balance, the operation is a mere exchange of the use of cars, and is, in no correct sense, earnings. But the amount received by any company for the use of its cars, in excess of the amount paid out by it for the use of the cars of other companies, is one of its sources of revenue earned by its rolling stock. In other words it is a part of the gross earnings mentioned in the statute, and should be so treated.

5. The relators had only the right of trackage over the Chicago, Milwaukee & St. Paul Railway from Schleisingerville to Milwaukee, a distance of thirty-three miles. The

question may arise whether the length of the road used under a mere right of trackage should be reckoned as a part of the mileage of the road. This question is unimportant in this case, and is not raised. The assistant attorney general concedes that this thirty-three miles may be included in such mileage. Hence the question is not determined.

We believe that the rules herein laid down cover all the material questions in this case. No doubt the relators and the proper authorities of the state can now readily agree upon the amount which the relators ought to pay as a license fee for 1883. We do not determine whether they have or have not already paid all that can legally be required of them. Neither do we determine whether there is any material issue of fact made by the pleadings. Both propositions are left open for the present, in the belief that the parties will adjust the whole matter without the further action of the court.[1]

*By the Court.*— Both motions are denied, without prejudice to the right of the respective parties to renew them, should the further exigencies of the case require it.

CASSODAY, J. Were it apparent, from secs. 1211, 1212, and 1213, R. S., that one of the purposes thereby sought to be secured was to enable every newly-constructed railroad to escape obtaining and paying for a first-class license until after such road had been operated one full calendar year,

[1] *Note by* LYON, J. Since filing the foregoing opinion, my attention has been called to the comments therein upon a clause quoted from the very able paper prepared by Mr. Turner and read in the argument, which, it was said, seemed to agree with the theory of the state. Upon a re-examination of that paper I am satisfied that Mr. Turner did not intend to assert the doctrine imputed to him in the opinion. He had already contended for the construction which the court has given the statute, and the clause quoted in the opinion was evidently inserted hypothetically for the purpose of meeting the case should the court reject the construction contended for.

and, in addition thereto, such fractional portion of a year, if any, as might happen, then I might agree with my brethren in the construction they have given to those sections. But no such legislative intent seems to be therein disclosed On the contrary, the general purpose seems to have been to raise revenue, by exacting from "every railroad company, and every person operating a railroad in this state" (except those operated by horse-power), a pecuniary consideration as a condition precedent to the exercise of a right otherwise perfect. *State ex rel. C., M. & St. P. R. Co. v. McFetridge,* 56 Wis. 260. Railroad property had already been especially exempted from ordinary taxation. Subd. 14, sec. 1038, R. S. The exaction of licenses is not to be construed as affecting such special exemption (sec. 1215); but is, nevertheless, in lieu of such taxation.

The sections relating to licenses only seem to contemplate railroads in existence and operation, leaving out such as are upon piles and pontoons; and sec. 1213 divided railroads into three classes, and the amount of the license exacted of each for the current year was therein graduated according to the value of its use as measured by its gross earnings in the preceding calendar year. The defect in the statute is the failure to fix any measurement of the value of such use of such newly-constructed railroad for the first calendar year, or the fraction of a year, it is so operated. But this defect does not indicate an affirmative intention to exempt from paying license, but only a failure to provide for enforcing its payment. This should not, and in my judgment does not, frustrate the graduated scheme of licenses for any subsequent year. To claim that it does, and that it was so intended, is to convict the legislature of the gross injustice of purposely imposing unequal burdens, and without uniformity. The mere fact that, under the sections cited, the value of such use for the current year is to be measured by the gross earnings in the previous year, does

not authorize the court, in determining such value, to treat such earnings during only a small fraction of the year the same as though the road had been operated the entire year to secure the same amount of earnings. To do so, is to assume facts which are untrue, in order to escape the consequences of facts which are true. To my mind, it would be very absurd to hold that the use of 100 miles of newly-operated railroad, upon which the gross earnings in the previous year were $14,000 for only two weeks, was of no greater value and should pay no higher license than another hundred miles of newly-operated railroad, upon which the gross earnings were only $14,000 for the whole fifty-two weeks of such year. Certainly the value of the use of one of such roads by such measurement would be twenty-six times greater than the value of the other; and under the statutes the one, in my judgment, would fall within the first class and the other within the third; but, according to the construction indicated, both would fall in the third.

To make the absurdity suggested still more apparent, let us suppose that 100 miles of road was completed and commenced operation March 1, 1881, and from that time was operated continuously until December 1, 1882, being twenty-one consecutive months, and then stopped and remained idle until the close of the month and then resumed. Let us further suppose that the gross earnings for any consecutive twelve months of the twenty-one had been $300,000; or, in other words, "three thousand dollars per mile *per annum* of operated railroad." It must be conceded by all that this would have made it a first-class road if such earnings had all been secured in twelve months constituting a calendar year; and can it be that the same amount of earnings in the same length of time would make it a second-class road, merely because the twelve months in which they were earned was made up of fractional portions of two calendar years? In determining the amount of "the gross earnings

per mile per annum," it is not perceivable why some particular twelve months has any special magic over any other twelve months in which such earnings are precisely the same; nor why just the twelve months constituting the calendar year has such magic over a less number of months, where the road is only operated during a portion of the year. To preclude the possibility of such an absurdity, as it seems to me, the legislature not only required " a true statement of the gross earnings . . . of the number of miles of road operated by each such company or person " for the preceding calendar year, " in such form and upon such blanks " as should be furnished by the state treasurer, but also such true statement of " the gross earnings *per mile per annum* during such year " (sec. 1211); and then, in order to determine to which of such three classes any such road belonged, it was made to depend entirely upon the amount of such gross earning "*per mile per annum.*" Subd. 1, 2, and 3, sec. 1213. To my mind a true statement in such form and upon such blanks, includes the length of time in such year that the road was operated in securing such earnings. The words " per mile per annum " thus used in one section, and five times repeated in the other section, have a meaning as well defined and as readily apprehended as " per centum per annum " in commercial law. And yet no one would dream of holding that five dollars as the gross earnings or interest for only fifteen days on a note of $1,000, were no greater *per centum per annum* than the same amount on the same note for 365 days.

I am unable to perceive how the words " per mile per annum " are equivalent to any other expression contained in either of the sections. Certainly not to the words " during such year," for they are both used in the same connection, thus: " the gross earnings per mile per annum during such year." Their repetition in sec. 1213 so many times, intensifies their significance in the minds of the legislature. It

seems to me that no more apt words could have been chosen to express the rate of the gross earning per mile per annum than to have taken words similar to those which have been used for centuries to express the rate of interest per annum. I do not understand it to be the province of the court to eliminate from a statute words having a clearly-defined meaning and not equivalent to nor in conflict with any other expression in the same statute. Nor am I able to perceive why such words are to be rendered meaningless, even if "such statutes must be construed with reasonable strictness against the government." Nor do I consent to such rule of construction. It is said that they must be so construed because "they impose involuntary burdens for revenue purposes upon those who operate railroads;" that "these impositions are called license fees, but in their objects and effects they are in the nature of taxes," and are subject to the same rules as "statutes imposing taxes *eo nomine.*" As indicated above, the whole of the railroad property was specially exempted from taxation. In lieu of taxes licenses are imposed. The rule seems to be inapplicable when invoked to support absolute exemption or unjust discrimination.

This question has been considered by this court in a case where taxes were levied and assessed upon certain lots belonging to the railroad company and occupied as a hotel. *Mil. & St. P. R. Co. v. Crawford Co.* 29 Wis. 116. The well-established rule was there invoked against the company on the ground that it was claiming the property to be exempt from taxation. In discussing the question, DIXON, C. J., said: "It is not easy to say this rule has any application in the present case; or, if it has, that it applies with much force." Page 123. He then went on to show that licenses were exacted in lieu of taxation, and added: "The payment of this sum into the state treasury, and which is called license money, must, in the light of past legisla-

tion upon the subject, be regarded as, in the judgment of the legislature, an equivalent for the taxes which those companies would otherwise be required to pay, if assessed and taxed according to the ordinary methods prescribed by law. A strict construction of the statute, therefore, against the company, or a liberal one in favor of the public, can, with difficulty, be justified, in view of what seems to have been the legislative intent, and it would seem that little or no effect can be given to the rule.   We are at liberty, therefore, and indeed required, to give the statute a fair ' and liberal construction in favor of the company, *or such an one as it should receive, supposing there is no injustice in the claim* made by the company, or *advantage* to be gained by it *over the public* or *tax-paying community generally*, in avoiding the taxation complained of." Pages 123, 124.  Here the claim made is to give the relators an advantage over other railroad companies and the tax-paying community generally; and hence, according to the intimation of the learned chief justice, the stringent rule against the company, and in favor of the public, is applicable.  That opinion was there sanctioned by two of the present members of this court, and I am not aware that it has ever been overruled.  On the contrary, it was expressly sanctioned in *Mil. & St. P. R. Co. v. Milwaukee*, 34 Wis. 277.  The stringent rule of construction maintained in the opinion of Mr. Justice TAYLOR in *State v. Pullman's Palace Car Co.*, from which I dissented, does not, as it seems to me, support the stringent rule of construction against the state here sanctioned, for the simple reason that Mr. Justice TAYLOR's opinion goes wholly upon the theory that Pullman's Palace Car Company had no property in the state which could be subjected to taxation.  Such being the theory of that opinion, it is obvious that the doctrine of absolute exemption or discrimination in favor of that company, and against others, was not involved in that

opinion, but is necessarily involved in the decision of this case.

For the reasons given I dissent from the opinion filed and the decision made.

Upon a motion for a rehearing briefs were filed by the *Attorney General* and *H. W. Chynoweth,* Assistant Attorney General, for the state, by *Geo. H. Noyes*, general solicitor of the Milwaukee & Northern Railroad Company, and by *S. U. Pinney*, for the relators.

The motion was denied October 13, 1885.