THE STATE EX REL. BELL vs. HARSHAW, State Treasurer, and TIMME, Secretary of State.

*February 25 — March 18, 1890.*

*Railroads: Lands granted by state: Exemption from taxation: License fees: State treasurer.*

1. By ch. 126, Laws of 1874, lands were granted to aid in the construction of a railroad, twenty miles of which were to be completed in each year, and patents for a certain quantity of the lands were to be issued to the railroad company on the completion of each twenty miles. Sec. 1, ch. 22, Laws of 1879, provided that all of such lands theretofore patented (and not sold), and all lands which might thereafter be patented, under the act of 1874, "are hereby exempted and shall remain exempt from taxation . . . for the period of ten years." *Held*, that the period of exemption commenced when the act of 1879 took effect, and completely terminated ten years thereafter as to all lands to which it was or could become applicable.

2. Sec. 6 of said act of 1879 provided that "each year, during the continuance of the exemption," the railroad company should pay, as a license fee, a sum equal to five per centum of its gross earnings for the preceding year. *Held*, that this merely prescribed a method for ascertaining the amount of the license fee for the year in which it was paid, and did not impose a tax on such gross earnings for the preceding year.

3. Under sec. 2, art. VIII, Const., the state treasurer cannot pay out moneys received by him as treasurer, "except in pursuance of an appropriation by law."

MANDAMUS to State Treasurer and Secretary of State.

The following statement of the case was prepared by Mr. Justice CASSODAY:

This is an application on behalf of the counties of Bay-

field and Burnett for a writ of *mandamus* to compel the apportionment and payment of $47,207.09, now in the hands of the state treasurer, pursuant to ch. 22, Laws of 1879. The relation alleges, in effect, the acts of Congress of June 3, 1856, and May 5, 1864, granting to this state a large quantity of public lands to aid in the construction of a railroad from the St. Croix river or lake to the west end of Lake Superior and Bayfield, upon conditions specified in said acts; that by ch. 126, Laws of 1874, the legislature of this state, for the purpose of aiding in the construction of said road, granted to the North Wisconsin Railway Company all the right, title, and interest which said state then had, or which it might thereafter acquire, in and to all of said lands applicable to said line of road, upon the performance of the conditions therein prescribed. The relation then sets out in full said ch. 22, Laws of 1879, which went into effect February 21, 1879, and further alleges, in effect, that May 25, 1880, articles of consolidation by and between said North Wisconsin Railway Company and the Chicago, St. Paul & Minneapolis Railway Company, a corporation then duly organized and existing under the laws of Wisconsin, were executed and recorded as required by law, by which articles there was created and incorporated pursuant to the laws of this state, and has ever since continued to exist, a new corporation, under the name of the Chicago, St. Paul, Minneapolis & Omaha Railway Company, and which, for convenience, will hereafter be called the Omaha Company; that by said articles of consolidation and incorporation the Omaha Company thereupon became, and ever since has been and now is, the successor, owner, and entitled to the possession, of all the property, franchises, rights, powers, privileges, and immunities, including all exemptions from fees and taxes, which had been provided by law, acquired by, granted to, or was at the time of said consolidation owned by, its predecessors; that said North Wiscon-

sin Railway Company duly accepted all the terms and conditions contained in both the acts mentioned, and began within the proper time the construction of said railroad, and its successor continued such construction, as provided by said acts, until December 3, 1883, when the same was fully completed and duly accepted by the state; that from time to time during the progress of and subsequent to the completion of said railway, upon due proof of the compliance of said North Wisconsin Railway Company and its successor with the terms of said laws, the governor of the state caused to be issued to said last-named company and its said successor proper patents to said lands; that a large amount thereof was so patented in each of the years 1874 and 1875, and each of the years 1880 to 1885, inclusive; that said North Wisconsin Railway Company and its said successor have in all things fully performed and fulfilled, or are ready and willing to do so, all the provisions of said laws, and each of them, on their part; that the North Wisconsin Railway Company and its said successor have from year to year, since the passage of said ch. 22, made a report of its gross earnings for the preceding year, paid to the state treasurer the five per centum thereof, and prepared and filed with the state treasurer and the several county treasurers the list of exempt lands, at the times and in the manner prescribed by sections 6 and 7 of said act; that during 1889 the said Omaha Company, as such successor, has paid to the state treasurer the sum of $47,207.09 as a five per centum of the gross earnings of its Northern Division, for the respective months of the year 1888, aggregating $944,141.77, as required by said ch. 22, and no other act, and the same was known to said treasurer at the time, and that he receipted for one half the amount thereof February 9, 1889, and the other half thereof August 5, 1889; that on the gross earnings of the other divisions of said Omaha Company's road for 1888, it paid at the same time,

to said state treasurer, a four per centum license fee, as provided in secs. 1211–1213, R. S.; that said Omaha Company, as such successor, was, August 1, 1889, the owner, under patents from the state issued since 1880, of 163,186 acres of land, the larger portion of which was situated in said counties of Bayfield and Burnett.

The relation also shows the number of acres exempt under said ch. 22, each year since its passage, the names of the counties within which they are situated, and the amount apportioned to each of said counties for each of said years pursuant to that chapter. It is also therein alleged, in effect, that by the terms of said ch. 22 it became and was the duty of said state treasurer, upon the receipt of said list or statement of exempt lands for 1889, to apportion the said $47,207.09 among said several counties upon the basis of the total acreage of land so exempt, and thereupon transmit, before September 15, 1889, to the county treasurer of each county in which such exempt lands are situated, the amount to which such county was, upon said basis, entitled; that, disregarding his said duty, in violation of said ch. 22, said state treasurer, upon receiving said list, refused and neglected, and still refuses and neglects, to either apportion or pay over to any or either of said counties the amount mentioned, or any part thereof; that the several counties named in which such exempt lands are or were situated have fully observed the provisions of said law; that subsequent to September 15, 1889, and prior to the regular annual meeting, in November, of the several county boards of said counties, due demand was made on said state treasurer that he apportion and pay over said sum to said several counties in the manner provided in said ch. 22, but that he refused, and still does refuse, to so apportion or pay over said sum, or any part thereof; that among the reasons given by said state treasurer for such refusal is that said ch. 22 expired by its own limitation

February 21, 1889, and that said counties have no right or interest in the sum named, or any part thereof.

To such relation the said *Harshaw* made return as required by law, which return consisted largely of admissions, and among other things admitted, in effect, that said North Wisconsin Railway Company and its successor has since the passage of said ch. 22 made report of its gross earnings for the preceding year, and paid to such treasurer five per centum of said earnings upon its Northern Division, now owned and occupied by the Omaha Company, and that said five per centum of its gross earnings for the year 1889 amounted to the sum stated, and that said sum was received by him from said company; but he expressly therein denies, in effect, that said amount was paid by said Omaha Company or received by said state treasurer as and for said five per centum provided by said ch. 22, and alleges, in effect, that said moneys were paid at the same time with the other license fees referred to in the relation and received from said company, and in a gross sum was transmitted to said treasurer, he receiving the same, and the whole thereof, as a license fee for the operation of all the lines of said Omaha Company in Wisconsin; that in the year 1879, and after the passage of said ch. 22, and on or before August 15, 1889, the said North Wisconsin Railway Company duly prepared and filed in the office of the state treasurer a list of all lands for which they had received patents which were exempt under the provisions of said ch. 22, showing the location of such lands as were located in the counties of Barron, Burnett, Polk, and St. Croix, and that said company paid to the state treasurer during the year 1879, and on or before August 10, 1879, a sum of money equal to five per centum of the gross earnings received by said company, as shown by its record then on file in the office of said treasurer, and that the said moneys received were apportioned between the above-named counties, and duly trans-

mitted and paid to them, the amounts paid each of said counties appearing upon Exhibit D, attached to said relation; that said North Wisconsin Railway Company and the said Omaha Company, as its successor, have for each year subsequent to 1879, up to and including 1888, duly filed said list of exempt lands, and paid to the treasurer of the state the sum of five per centum upon the gross earnings of the North Wisconsin Railway Company, now known as the Northern Division, and that the amount received during said years, respectively, from said company or companies, has been duly apportioned between the counties in which said lands were located, as shown by said Exhibit D; that the Omaha Company duly filed the list of lands before August 15, 1889, showing the location of lands still held by it, being the number of acres and in the counties as shown by said Exhibit D, but that said treasurer has refused to apportion the amount of license fee paid by said company upon said Northern Division among the counties in which said lands are located, for the reason, as he is advised and verily believes, that the time for which said lands were exempt from taxation as provided by said ch. 22 had expired before the filing of said list or the payment of said license fee, and, having so expired, that none of the counties named in the petition or shown upon said Exhibit D were entitled to receive said money, or any portion thereof.

To such return so made by said state treasurer the relator demurs on the ground that it does not state a defense to said relation.

The respondent *Timme* moves the court to quash such alternative writ, as to him, on the ground, in effect, that the petition does not set forth facts sufficient to impose upon him the duty of issuing warrants for said money upon the state treasury.

For the relator there were briefs by *Thomas C. Richmond* and *J. Burritt Smith*, and oral argument by *Mr. Smith*.

For the respondents there was a brief by the *Attorney General,* and *L. K. Luse,* Assistant Attorney General, and oral argument by *Mr. Luse.*

CASSODAY, J.   The grant to the North Wisconsin Railway Company, by ch. 126, Laws of 1874, was upon the express condition that the said company should immediately proceed with the construction of said road, and should construct so much thereof the first year as should, with that already constructed, make forty miles, and not less than twenty miles each year thereafter, and that the whole should be completed *within seven years* after the passage of said act; and the act required the company, upon acceptance, to give a bond, as prescribed, for the performance of such condition, with a forfeiture in case of failure; and the governor was therein required, *as often* as "satisfactory proof that twenty continuous miles" of said road should be completed as required, to issue and deliver, or cause to be issued and delivered, to said company, patents in due form, from the state, for 200 sections of said lands.   That act contained no exemption of the lands to be so patented, from taxation.   Had that act been complied with, the whole of that line of the road would have been completed in 1881, and the company then would have been entitled to all its patents.   Of course, as fast as any portion of said railway was completed and went into operation, it was required, as the law then stood, to pay the license fee prescribed by the general statutes then in force.   Secs. 1211–1213, R. S..

Sec. 2, ch. 113, Laws of 1875, provided that "all those railroad companies whose lines of road are now incomplete or are in process of construction, and to aid in the building of which the 'general government has donated grants of land, and which are not exempted from taxation on said lands for the next five years, *are hereby exempted* from the payment of the license fees required by law for said five

years." That section applied to the North Wisconsin Railway, then incomplete and in process of construction, and exempted that company from the payment of such license fees for the said period of five years; that is to say, to January 1, 1880.

Sec. 1212, R. S. (ch. 261, Laws of 1878), provided, in effect, that the lands applicable to the construction of said road, by said company, through the counties of Ashland and Bayfield, and which might be acquired by the construction of the same, "shall be and remain exempt from all assessments and all taxation of every kind for the period of five years from the time such company acquires title to the same," except that whenever any of said lands should be sold, contracted to be sold, or leased, the same should immediately become subject to taxation; but that exemption was subject to the condition that not less than twenty miles of said road, commencing at some point between Ashland and Bayfield, should be completed before April 2, 1880, and provided that the act should only apply to said lands in those two counties.

Sec. 1, ch. 22, Laws of 1879, provided, in effect, that all lands theretofore patented by the state to the said North Wisconsin Railway Company not theretofore sold or contracted to be sold by said company, and all lands which might thereafter be patented by the state to the said company under ch. 126, Laws of 1874, "*are hereby exempted*, and shall *remain* exempt, from taxation of all kinds, general and local, and from assessments of every nature, *for the period of ten years*." Sec. 4 of the act provided, in effect, that whenever any of the lands so exempted should be sold, contracted to be sold, leased, or conveyed, or the pine thereon sold or cut, the same should immediately become taxable. Sec. 5 of the act declared, in effect, that the main object and purpose of the act was to aid in securing the completion and equipment of said railway, and to en-

able the company to apply the avails of its lands to such construction and equipment; the exemption therein provided being, in the opinion of the legislature, necessary for said purposes and demanded by the public interest. Sec. 6 of the act provided, in effect, that the said North Wisconsin Railway Company should, "*at the times and in the manner* fixed by the Revised Statutes for similar reports from other railroads of the state, make a report of its gross earnings *for the preceding year*, and shall *each year, during the continuance of the exemption provided by section one*, pay into the state treasury, at the times fixed by the Revised Statutes for the payment by railway companies of their license fees, a sum equal to' five per centum of its gross earnings *for the preceding year*, which will be in lieu of all other license fees exacted from said company." Sec. 7 of the act provided, in effect, that the company should, on or before August 15th in each year, cause a sworn list of the lands owned by it August 1st in such year in each of said several counties, and exempt from taxation, to be prepared, and to file a copy thereof in the office of the state treasurer, and also send a copy thereof to the treasurers of said counties, respectively. Sec. 8 of the act provided, in effect, that the state treasurer, on the receipt of said list, should apportion the amount of money so received from the company among said several counties as they might be entitled to the same under that act, and thereupon pay over the same to said counties, respectively.

The five per centum thus to be apportioned among and paid to the respective counties named, was a sum equal to five per centum of the gross earnings of the company for the preceding year, as required by sec. 6 of the act. By that section, such five per centum was only to be paid into the state treasury at the times fixed by secs. 1211–1213, R. S., for the payment by railway companies of their license fees for "*each year during the continuance of the ex-*

*emption provided by section one*" of that act. The material question for consideration, therefore, is, When did the exemption prescribed by sec. 1 of the act commence, and how long did it, or was it to, continue?

The learned counsel for the relator contends that the words, "are hereby exempted, and shall *remain* exempt, from taxation of all kinds, . . . *for the period of ten years*," should be construed as not commencing, as to any batch of lands subsequently patented by the state to the company, until they were in fact so patented, and then, as to that batch, continue for the period of ten years from the date of such patents, unless in the meantime the company should part with the title, or sell or cut the pine thereon, and that the same rule would apply to each and every batch so subsequently patented. A moment's reflection as to the facts and circumstances existing at the time of the passage of the act, and the law applicable, will reveal the endless confusion that such a construction would necessarily create. As indicated in the foregoing statement, at the time that section went into effect a large portion of said lands had been patented to the company by the state; and many of them had been expressly exempted from taxation, and were still exempt. Only a portion of the line of road, however, had been constructed. As often as twenty miles of the road was subsequently constructed, the company was entitled to a new batch of patents therefor. The whole was not completed until December 3, 1883. Of course, such land-grant lands, even in the place limits, only became taxable as fast as they were earned by such construction and certified to by the state authorities. But none of such lands as were situated in the indemnity limits, even though so earned and so certified to, became taxable until actually selected and such selections actually approved by the secretary of the interior. *Wis. Cent. R. Co. v. Price Co.* 133 U. S. 496, in part reversing *S. C.* 64 Wis. 579. As there held,

no constructive approval would render them taxable. Quite likely, some of those lands have not yet been so approved; and as to them, on the theory of counsel, the ten years would not begin until such approval. That theory would obviously lead to almost endless confusion, and should not be adopted unless imperatively demanded by the language of the section.

The words "exempted," and "*remain* exempt . . . for *the period* of ten years," pretty clearly indicate that the legislature only contemplated *one ten years period of exemption*, and that that should include all such lands whether previously patented and then exempt, or exempt by reason of not yet having been earned and certified, or such as should be subsequently patented. This construction is strengthened by the well-settled rule in such cases repeatedly sanctioned by the supreme court of the United States, and very recently in these words: "Exemptions from taxation are regarded as in derogation of the sovereign authority and of common right, and therefore not to be extended beyond the exact and express requirements of the language used, construed *strictissimi juris*." *Yazoo & M. V. R. Co. v. Thomas*, 132 U. S. 185; *Vicksburg, S. & P. R. Co. v. Dennis*, 116 U. S. 668, and cases there cited. We must hold that the period of ten years of such exemption commenced February 21, 1879, and completely terminated as to any and all lands to which it was or could become applicable, February 21, 1889.

But it is contended by counsel for the relator that, even if such be the true construction of the section, yet that the five per centum so received by the state treasurer in 1889 was, in effect, a tax upon the gross earnings of that line of road for the year 1888, and hence that the counties in question were respectively entitled to their share of the same. The sixth section, however, provides, in effect, that such license fee to be so paid by said company for any current

year should be "*a sum equal* to five per centum of its gross earnings for the preceding year," payable at the times fixed in the general statutes. Secs. 1211–1213, R. S. In other words, that section and these general statutes merely prescribed that as the way for measuring and ascertaining the amount of such license fee for the year in which it was granted, and not as a tax on such gross earnings for such preceding year. *State ex rel. C., M. & St. P. R. Co. v. McFetridge*, 56 Wis. 256. Under this construction, the counties in question respectively received their proportionate share of such license fees collected under said ch. 22 in the year 1879, and each of the following years, down to and including 1888, making ten consecutive years in all, or, in other words, the full period of such exemption. This fully appears from the relation as well as the return.

But counsel for the relator further contend that, even if such constructions are correct, and the counties in question have no legal right to the license fees so collected for the year 1889, yet that, as the company voluntarily paid them as such five per centum under said ch. 22, and the state treasurer received them as such, he thereby became a mere trustee for said counties, and hence is estopped from denying such trust, or refusing to execute the same by apportioning and paying over the money. There are several difficulties in the way of such contention. In the first place, it must be admitted that he received the moneys as state treasurer, and not as a mere individual. His duties as such state treasurer were prescribed by law. Since the law, as we have found, did not require him to apportion and pay that money over to the counties in question, it is very obvious that he, as such treasurer, owed no duty to them to do so. Besides, it appears from his return that he received said money with all other license fees due from the Omaha Company in gross, and receipted for the whole, and did not receive them specifically as five per centum paid under

said ch. 22; and he very properly claims that he is entitled to four fifths of said $47,207.09 as the amount due the state from the company for the year 1889, under secs. 1211–1213, R. S., and that, if he is not entitled to hold the other fifth, it is a matter entirely between the state treasurer and the Omaha Company, as to which none of the counties in question, as counties, have any concern. We are constrained to believe that such are the legal rights of the parties. But there is still another reason which seems to be a perfect bar to the claim of the relator, regardless of whether one fifth of the amount named is rightfully or wrongfully in the hands of the state treasurer. It is enough to know that the whole amount is now in the state treasury, and that the constitution provides that " no money shall be paid out of the treasury except in pursuance of an appropriation by law." Sec. 2, art. VIII, and amendment to the same. Since there is no law authorizing such apportionment among and payment to the counties in question, the state treasurer has no lawful right to make the same.

*By the Court.*— The demurrer to the return is overruled, and the alternative writ of *mandamus* is quashed.